David C. Parisi, Esq. (SBN 162248)
Suzanne Havens Beckman, Esq. (SBN 188814)
PARISI & HAVENS, LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299
dparisi@parisihavens.com
shavens@parisihavens.com

Attorneys for Plaintiff Rudolf Zijdel and
all others similarly situated

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| RUDOLF ZIJDEL, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>THUMBPLAY, INC., a Delaware corporation, M-QUBE, INC., a Delaware corporation, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. **109CV144513**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violation of Consumer Legal Remedies Act;<br>(2) Violation of Unfair Competition Law;<br>(3) Unjust Enrichment; and<br>(4) Tortious Interference with a Contract<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiff Rudolf Zijdel ("Zijdel" or "Plaintiff") brings this class action complaint against Defendants Thumbplay, Inc. ("Thumbplay") and m-Qube, Inc. ("m-Qube") based upon Defendants' practice of charging cellphone subscribers for unauthorized services.

Complaint

## PARTIES

1. Plaintiff Rudolf Zijdel is a resident of New Jersey.

2. Thumbplay is a provider of mobile content in the United States and is a Delaware corporation with its headquarters and principal place of business in the State of New York.

3. M-Qube is an aggregator of mobile content in the United States and is a Delaware corporation with its headquarters and principal place of business in the State of California.

4. Plaintiff is currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein under the fictitious names Does 1 through 100, inclusive, and therefore, sues such defendants by such fictitious names. Plaintiff will seek leave to amend this complaint to allege the true names and capacities of said fictitiously named defendants when their true names and capacities have been ascertained. Plaintiff is informed and believes and based thereon alleges that each of the fictitiously named Doe defendants is legally responsible in some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiff.

5. Plaintiff is informed and believes and based thereon alleges that all defendants, including the fictitious Doe defendants, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of all other defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants; however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contraction with the other allegations.

6. All Defendants, including Does 1 through 100, are collectively referred to as "Defendants."

7. Whenever this complaint makes reference to any act of Defendants, the

Complaint

2

allegations shall be deemed to mean the act of those defendants named in the particular cause of action, and each of them, acting individually, jointly and severally, unless otherwise alleged.

## JURISDICTION

8. This Court has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts.

9. This Court has jurisdiction over Defendant pursuant to Code of Civil Procedure § 410.10 because Defendant resides in and/or conducts business in the State of California and/or many of Defendants' wrongful acts arose or emanated from California.

## VENUE

10. Venue is proper in this Court pursuant to Code of Civil Procedure because defendants reside in this county.

## CONDUCT COMPLAINED OF

11. Today's cell phones are far more than mobile versions of a standard, land-based telephone. Instead of mere tools for sending and receiving calls, modern cell phones can be used to link users to a range of informative and entertaining content, such as weather and traffic reports, sports scores, stock tips, and jokes; they can also be used to access radio and television services, and can even be used as credit cards. These additional services and content are referred to as "mobile content."

12. Carriers such as T-Mobile do not create a majority of mobile content, instead, a plethora of smaller, independent entities create the mobile content ("mobile content providers"). However, while these smaller entities create the mobile content, they do not bill cell phone users directly.

Complaint

3

13. Instead, mobile content providers such as Thumbplay partner with middlemen known as "aggregators," such as m-Qube. The aggregators provide a conduit between the numerous and diverse small mobile content providers and the large cell phone carrier to facilitate the mobile content providers' ability to (a) use a carrier's network to deliver their services to that carrier's cellular subscribers; and (b) use a carrier's billing system to collect payment for their mobile content services from that carrier's subscribers. In return, the aggregators and the carriers each keep a percentage of every mobile content service charge.

14. The mobile content industry generates vast revenue for all parties involved – the mobile content provider, the aggregator, and the cell phone carriers. However, not all of this revenue has been legitimately and lawfully collected. The primary sources of the problem are the misleading marketing representations made by unscrupulous mobile content providers and the inadequacy of the cell phone carriers' billing systems.

15. Put simply, industry participants collectively, including Defendants, have constructed billing systems with no checks to insure that when an aggregator places a charge for mobile content on one of its subscriber's bills, that subscriber actually desired the mobile content service, and authorized the charge for the service. Instead, an aggregator need only provide a carrier with a subscriber's name and cell phone number in order to place a charge for mobile content services on that subscriber's bill. The result is that an untold number of cell phone subscribers have been charged for mobile content services they never authorized. Because Defendant profits significantly, it has done nothing to remedy this flawed billing system.

16. By way of illustration, a consumer who uses a check must sign that check to prove he or she authorizes payment. Some merchants also require check-users to show an additional form of identification such as a drivers' license or state-issued i.d. An issuing bank then uses that signature to verify whether the consumer actually authorized payment. Similarly, a consumer who uses a credit card must provide, at a minimum, both the credit

Complaint

4

card number and date of expiration. More often than not a credit card user must also sign a receipt, or, if the transaction takes place online, provide his or her three-digit credit card security code or the zip code of the card's billing address. Credit card providers have additional levels of security in place that analyze a consumer's particular transaction, based upon the transaction's similarity to that consumer's previous transactions, determining how likely a particular transaction may be the result of fraud or theft.

17. In stark contrast, a mobile content provider can cause any consumer to be billed for mobile content services once it has that consumer's cell phone number, even if the consumer never agreed to purchase its services or was never informed about the charge for such services. The mobile content provider can simply provide an aggregator a cell phone number and an amount to be charged, the aggregator then instructs the carrier to place the charge on the bill related to that number. Because each of the three parties involved—the mobile content provider, the aggregator, and the cell phone carrier—keeps a portion of every charge, they maintain this system despite knowing that large numbers of people are being billed for services they neither wanted nor authorized.

18. This problem is exacerbated by the fact that charges for mobile content services are often not clearly identified on subscribers' bills, thereby making it impossible for subscribers to identify the origin or nature of the charge, or to distinguish it from the numerous line-item charges and fees that appear on the average consumer's cell phone bill. In addition, because charges for mobile content services are sometimes just a few dollars, subscribers who use automatic bill-paying services may never even notice them.

19. Defendant and its industry partners could easily stop this system by requiring the production of some form of reliable proof that a subscriber did, in fact, purchase such mobile content. One way to do this would be by providing each of its subscribers a unique code to use whenever making mobile content purchases, and by requiring all third parties, including Defendant, to provide that same code to carriers before allowing third parties to

Complaint
5

cause one of subscribers to be charged. In addition, Defendant could provide on each subscriber's bill information as to (1) the party responsible for mobile content service charges; (2) a description of the mobile content service being charged for; (3) the method in which the consumer allegedly purchased such service (*i.e., via* the internet, mail, or in-person); and (3) the date the consumer allegedly purchased the service.

20.  Despite Defendants' ability to stop their unauthorized billing practice, they have purposefully maintained this system because it is a source of significant profit. Given the growth of the mobile content services industry and the increasing opportunities for cell phones to be used as credit cards, however, the damage Defendants have caused thus far pales in comparison to the damage that will occur if this system is not corrected.

21.  Defendants have, on information and belief, profited greatly through their system of unauthorized billing.

22.  Moreover, Defendants are fully aware that many of their subscribers claim they never authorized charges for mobile content services, and Defendants realize that their billing systems do not provide a method of verifying whether a subscriber did, in fact, authorize charges for mobile content.

23.  Defendants' continued billing of subscribers for mobile content services, combined with their failure to implement a billing system that will ensure only subscribers who did, in fact, authorize charges for such services are billed, is a deliberate strategy by Defendants to unlawfully collect small sums of money from a large number of consumers.

### THE FACTS RELATING TO NAMED PLAINTIFF

24.  In or about 2000, Plaintiff purchased new cell phone service from T-Mobile for his family's use from an authorized sales representative of an established wireless carrier.

25.  On that same day, in exchange for a cellular telephone service plan, Plaintiff agreed to pay such carrier a set fee for a period of several months.

Complaint

6

26. Beginning in or about 2007, Plaintiff's cell phone account was charged by Defendants for unwanted ringtones associated with copyrighted music owned by Universal Music Group.

27. During the relevant time period, Defendants caused Plaintiff to be charged service fees in the amount of several dollars for such mobile content charges.

28. At no time did Plaintiff authorize the purchase of these products and services offered by Defendants.

29. At no time did Plaintiff authorize Defendants or anyone else to bill him for these charges.

30. At no time did Defendants verify Plaintiff's purported authorization of these charges.

31. Defendants have yet to provide a full refund of the unauthorized charges consisting of the premium text message charges, ordinary text messages, data charges, back interest, nor have they implemented adequate procedures to ensure that such unauthorized charges will not appear in future billing periods and/or given an assurance that such unauthorized charges will not appear in future billing periods.

## CLASS ALLEGATIONS

32. Plaintiff brings this action, pursuant to Code of Civil Procedure § 382 on behalf of himself and a class, defined as follows:

> A. The Class: all T-Mobile wireless telephone subscribers in the nation who suffered losses or damages as a result of Defendant Thumbplay's billing during 2007 for ringtones based on copyrighted music owned by Universal Music Group not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the Defendants, and (ii) any employee of the Defendants.

Complaint

33. The Class consists of thousands of individuals and other entities, making joinder impractical, in satisfaction of Code of Civil Procedure § 382.

34. Plaintiff's claims are typical of the claims of all of the other members of the Class.

35. Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

36. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

37. Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

38. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

39. There are many questions of law and fact common to Plaintiff's claims and the claims of the other members of the Class. Those questions predominate over any questions that may affect individual members of the Class.

40. Common questions for the Class include but are not limited to:

Complaint

8

      (a)      Whether Defendants have unjustly received money belonging to Plaintiff and the Class and whether under principles of equity and good conscience, Defendants should not be permitted to retain it.

      (b)      Whether Defendants tortiously interfered with contracts between Plaintiff and Class, on the one hand, and their wireless carriers, on the other hand, by causing them to be charged by their carriers for unauthorized products and services.

### FIRST CAUSE OF ACTION
**(Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 on behalf of the Class against all Defendants)**

41. Plaintiff incorporates by reference the foregoing allegations.

42. Defendants' charges to Plaintiff and the other class members falsely state that Plaintiff and the other Class members have approved, authorized, and/or consented to charges for mobile content services, and are deceptive and unfair. Further, Defendants' charges are unlawful because they violate the CLRA, CFAA, and/or the FCA.

43. The acts alleged above are unlawful, unfair or fraudulent business acts or practices and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

44. Plaintiff, on his own behalf and behalf of the other Class members, seeks an order enjoining Defendants' unfair competition alleged herein, and restitution of property gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorneys' fees and costs pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

### SECOND CAUSE OF ACTION
**(Restitution/Unjust Enrichment on behalf of the Class against all Defendants)**

66. Plaintiff incorporates by reference the foregoing allegations.

67. A benefit has been conferred upon Defendants' by Plaintiff and the Class. Defendants have received and retain money belonging to Plaintiff and the Class resulting

Complaint

from its billing and collecting significant amounts of money in unauthorized mobile content charges.

68. Defendants appreciate or have knowledge of said benefit.

70. Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the Class, which it has unjustly received as a result of its actions.

71. Plaintiff and the Class have suffered loss as a direct result of Defendants' conduct.

### THIRD CAUSE OF ACTION
**(Tortious Interference with a Contract on behalf of the Class against all Defendants)**

66. Plaintiff incorporates by reference the foregoing allegations.

67. Plaintiff and the Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to Plaintiff and the other members of the Class, and to bill Plaintiff and the Class only for products or services the purchase of which they authorized.

68. Defendants' knew of said contractual relationships and intended to and did induce a breach or disruption of those relationships.

70. Defendants' intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing unauthorized charges to be placed on the cellular telephone bills of cellular subscribers across the nation.

71. Plaintiff and the other members of the Class suffered loss as a direct result of Defendants' conduct.

Complaint

10

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rudolf Zijdel, on behalf of himself and the Class, prays for the following relief:

a) Certify this case as a class action on behalf of the Class defined above, appoint Rudolf Zijdel Class Representative, and appoint Parisi & Havens, LLP, as lead counsel;

b) Declare that Defendants' actions, as set out above, constitute unjust enrichment and tortious interference with a contract, and are violations of the UCL;

c) Enter judgment against Defendants for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct, and if its conduct is proved willful, award Plaintiff and the Class exemplary damages;

d) Award Plaintiff and the Class reasonable costs and attorneys' fees;

e) Award Plaintiff and the Class pre- and post-judgment interest;

f) Enter judgment for injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

g) Award such other and further relief as equity and justice may require.

Dated: June 9, 2009

PARISI & HAVENS, LLP

By: _____
David C. Parisi, Esq.
Suzanne Havens Beckman, Esq.
Attorneys for RUDOLF ZIJDEL,
individually and on behalf of a class of
similarly situated individuals

Complaint

11

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: June 9, 2009

PARISI & HAVENS, LLP

By: _____
David C. Parisi, Esq.
Suzanne Havens Beckman, Esq.
Attorneys for RUDOLF ZIJDEL,
individually and on behalf of a class of
similarly situated individuals

Complaint

12