1  David C. Parisi (SBN 162248)
   Email: dcparisi@parisihavens.com
2  Suzanne Havens Beckman (SBN 188816)
   PARISI & HAVENS, LLP
3  15233 Valleyheart Drive
   Sherman Oaks, California 91402
4  Tel: 818.990.1299
   Fax: 818.501.7852
5

6  *Attorneys for Plaintiff*
   RUDOLF ZIJDEL and the putative class
7

8                 **UNITED STATES DISTRICT COURT**

9                **NORTHER DISTRICT OF CALIFORNIA**

10                      **SAN JOSE DIVISION**

11

12  RUDOLF ZIJDEL, individually and on        Case No.: 5:09-03252 (JW)
    behalf of all others similarly situated,
13                                            **FIRST AMENDED CLASS ACTION
                                              COMPLAINT FOR:**
14                     Plaintiff,
                                              **(1) Unjust Enrichment;**
15  v.                                        **(2) Tortious Interference with Contract;**
                                              **(3) Violation of California's Computer
16  THUMBPLAY, INC., a Delaware                   Crime Law;**
    corporation, M-QUBE, INC., a Delaware     **(4) Violation of Consumer Legal Remedies
17  corporation, and DOES 1-100, inclusive,       Act; and**
                                              **(5) Violation of Unfair Competition Law.**
18                     Defendants.

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT                    1
                                                            No. 5:09-03252 (JW)

1

2

**FIRST AMENDED CLASS ACTION COMPLAINT**

3

Plaintiff Rudolf Zijdel ("Zijdel" or "Plaintiff") brings this First Amended cClass Action

4

Complaint against Defendants Thumbplay, Inc. ("Thumbplay") and m-Qube, Inc. ("m-Qube"),

5

and Does 1 through 100, based upon Defendants' practice of charging cell phone subscribers for

unauthorized products and services.

6

**PARTIES**

7

1.      Plaintiff Rudolf Zijdel is a natural person and citizen of the state of New Jersey.

8

2.      Thumbplay is a provider of mobile content in the United States and is a

9

corporation organized and existing under the laws of the state of Delaware, with its headquarters

10

and principal place of business in the state of New York.

11

3.      M-Qube is an aggregator of mobile content in the United States and is a

12

corporation organized and existing under the laws of the state of Delaware, with its headquarters

13

and principal place of business in the state of California.

14

4.      Plaintiff is currently ignorant of the true names and capacities, whether individual,

15

corporate, associate, or otherwise, of the defendants sued herein under the fictitious names Does 1

16

through 100, inclusive, and therefore, sues such defendants by such fictitious names.  Plaintiff

17

will seek leave to amend this complaint to allege the true names and capacities of said fictitiously

18

named defendants when their true names and capacities have been ascertained.  Plaintiff is

19

informed and believes, and based thereon alleges, that each of the fictitiously named Doe

20

defendants is legally responsible in some manner for the events and occurrences alleged herein,

21

and for the damages suffered by Plaintiff and the putative class.

22

5.      Plaintiff is informed and believes, and based thereon alleges, that all Defendants,

23

including fictitious Doe defendants, were at all relevant times acting as actual agents,

24

conspirators, ostensible agents, partners and/or joint venturers and employees of all other

25

Defendants, and that all acts alleged herein occurred within the course and scope of said agency,

26

employment, partnership, and joint venture, conspiracy or enterprise, and with the co-Defendants;

27

28

Plaintiff's First Amended Complaint

2

Case No. C 09-03252 RS

however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contradiction with the other allegations.

6.      All Defendants, including Does 1 through 100, are collectively referred to as "Defendants."

7.      Whenever this First Amended Complaint makes reference to any act of Defendants, the allegations shall be deemed to mean the act of those defendants named in the particular cause of action, and each of them, acting individually, jointly and severally, unless otherwise alleged.

## JURISDICTION

8.      The Superior Court of the State of California for the County of Santa Clara has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, VI, § 10, because this case is a cause not given by statute to other trial courts.

9.      The Superior Court of the State of California for the County of Santa Clara has jurisdiction over Defendants pursuant to Code of Civil Procedure § 410.10 because Defendants reside in and/or conduct business in the State of California and/or many of Defendants' wrongful acts arose or emanated from California.

10.     Plaintiff disputes that this Court (i.e., the United States District Court for the Northern District of California, San Jose Division), has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332, *et seq*[1] or on any other basis.

## VENUE

11.     Venue is proper in the Superior Court of the State of California for the County of Santa Clara pursuant to the Code of Civil Procedure because Defendant m-Qube resides in that county.

---

[1]     On July 16, 2009, Thumbplay removed the case to this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332, *et seq*. On August 17, 2009, Plaintiff moved to remand the case back to the Santa Clara Superior Court on the basis that Thumbplay failed to prove by a preponderance of the evidence that the amount in controversy in this case meets or exceeds $5 million, thereby conferring subject matter jurisdiction over the matter to this Court. Plaintiff's motion to remand is currently pending and set for hearing on November 2, 2009.

Plaintiff's First Amended Complaint                    3                          Case No. C 09-03252 RS

1

**CONDUCT COMPLAINED OF**

2

3

12.     Today's cell phones are far more than mobile versions of a standard, land-based

4

telephone.  Instead of mere tools for sending and receiving calls, modern cell phones can be used

5

to link users to a range of informative and entertaining content, such as weather and traffic

6

reports, sports scores, stock tips, and jokes; they can also be used to access radio and television

7

services, and can even be used as credit cards. These additional services and content are referred

8

to as "mobile content."  These services are delivered to consumers through their mobile devices

9

such as cellular telephones and personal digital assistants (*i.e*. "Blackberrys" and "iPhones").  The

10

data is transmitted to the cell phones primarily in the form of text messages and related

11

technology, which trigger corresponding fees that appear on consumers' cell phone bills as line-

12

item charges.

13

13.     Wireless carriers such as T-Mobile do not create a majority of mobile content,

14

instead, a plethora of smaller, independent entities known as mobile content providers create the

15

mobile content.  However, while these smaller entities create the mobile content, they do not bill

16

cell phone subscribers directly.

17

14.     Instead, mobile content providers such as Thumbplay partner with middlemen

18

known as aggregators, such as m-Qube.  The aggregators provide a conduit between the

19

numerous and diverse, relatively small, mobile content providers and the large cell phone carriers

20

to facilitate the mobile content providers' ability to (a) use a carrier's network to deliver by means

21

of text message technology their services to that carrier's cellular subscribers; and (b) use a

22

carrier's billing system to collect payment for their mobile content services from that carrier's

23

subscribers.  In return, the aggregators and the carriers each keep a percentage of every mobile

24

content transaction.

25

15.     Thus, just as providers of premium mobile content such as Thumbplay deliver

26

their products by means of cell phone and specifically text message technology, they likewise

27

charge and collect from their customers by "piggybacking" on the cell phone bills sent out by

28

wireless carriers.

Plaintiff's First Amended Complaint

4                           Case No. C 09-03252 RS

16.     The mobile content industry generates vast revenue for all parties involved – the mobile content providers, the aggregators, and the cell phone carriers.  However, not all of this revenue has been legitimately and lawfully collected.  Indeed, Defendants, in concert with the wireless carriers, have knowingly billed and collected vast sums of money from cell phone subscribers for Thumbplay's mobile content products and services without authorization from such subscribers.

17.     Put simply, industry participants collectively, including and specifically in this case Defendants, have constructed billing systems with no checks or safeguards to ensure that when a content provider instructs an aggregator to place a charge on a given cell phone account, an aggregator proceeds to place a charge on a subscriber's account, and the carrier proceeds to issue the bill to a given subscriber, that the subscriber actually desired the mobile content service and authorized the related charge.  Instead, Thumbplay simply gains access to a cell phone number and then provides that number, along with an amount to be charged, to its billing aggregator (in this case m-Qube), who in turn, provides a wireless carrier with that cell phone number and an instruction to place a charge for mobile content services on the associated bill.  The result is that an untold number of cell phone subscribers have been charged for mobile content services they never authorized.  Because Defendants profit significantly, they have done nothing to remedy this flawed billing system.

18.     In stark contrast, consumers who use such things as checks must sign such checks to prove they authorize payment.  Some merchants also require check-users to show an additional form of identification such as a driver's license or state-issued identification card.  An issuing bank then uses that signature to verify whether the consumer actually authorized payment.  Similarly, a consumer who uses a credit card must provide, at a minimum, both the credit card number and date of expiration.  More often than not a credit card user must also sign a receipt, or, if the transaction takes place online, provide his or her three-digit credit card security code or the zip code of the card's billing address.  Credit card providers have additional levels of security in place that analyze a consumer's particular transaction, based upon the transaction's similarity to

that consumer's previous transactions, determining how likely a particular transaction may be the result of fraud or theft.

19.     Thumbplay gains access to thousands of cell-phone numbers by maintaining websites that contain misleading, oblique, or inadequately explained consent procedures; knowingly partnering with affiliate marketers who employ anti-consumer practices, such as negative consent options; systematically declining to require those with whom it contracts to obtain consumers' consent to be charged for Thumbplay's mobile content; and by collecting small amounts on an individual customer basis.  Once Thumbplay gains access to a given cell phone number it then proceeds to bill cell phone subscribers for its mobile content products and services without authorization.

20.     The problem of billing for unauthorized mobile content is exacerbated by the fact that charges for mobile content services are often not clearly identified on subscribers' bills, thereby making it impossible for subscribers to identify the origin or nature of the charge, or to distinguish it from the numerous line-item charges and fees that appear on the average subscriber's cell phone bill.  In addition, because charges for mobile content services are sometimes just a few dollars, subscribers who use automatic bill-paying services may never even notice them.

21.     Defendants and their industry partners could easily cure the defects in this system by requiring the production of some form of reliable proof that a subscriber did, in fact, purchase such mobile content.  One way to do this would be by providing each of their subscribers a unique code to use whenever making mobile content purchases, and by requiring all third parties, including Defendants, to provide that same code to carriers before allowing third parties to cause subscribers to be charged.  In addition, Defendants could provide on each subscriber's bill information as to (1) the party responsible for mobile content service charges; (2) a description of the mobile content service being charged for; (3) the method in which the consumer allegedly purchased such service (i.e., via the Internet, mail, or in-person); and (3) the date the consumer allegedly purchased the service.

22.     Despite Defendants' ability to stop their unauthorized billing practices, they have purposefully maintained this system because it is a source of significant profit.  Given the growth of the mobile content services industry and the increasing opportunities for cell phones to be used as credit cards, however, the damage Defendants have caused thus far pales in comparison to the damage that will occur if this system is not corrected.

23.     Defendants have, on information and belief, profited greatly through their system of unauthorized billing.

24.     Moreover, Defendants are fully aware that many of their subscribers claim they never authorized charges for mobile content services, and Defendants realize that their billing system does not provide them with a method of verifying whether a subscriber did, in fact, authorize charges for mobile content.

25.     Defendants' continued billing of subscribers for mobile content services, combined with their failure to implement a billing system that will ensure only subscribers who did, in fact, authorize charges for such services are billed, is a deliberate strategy by Defendants to unlawfully collect small sums of money from a large number of consumers.

## THE FACTS RELATING TO NAMED PLAINTIFF

26.     In or about 2000, Plaintiff purchased new cell phone service for his personal use from an authorized sales representative of T-Mobile.

27.     On that same day, in exchange for a cellular telephone service plan, Plaintiff agreed to pay T-Mobile a set fee for a period of several months.

28.     Beginning in or about May 2007, Defendants began charging Plaintiff's cell phone account for unwanted Thumbplay mobile content services, totaling approximately $49.75.  The charges were placed and appeared on Plaintiff's cell phone bill issued by T-Mobile.

29.     During the relevant time period, Defendants caused Plaintiff to be charged service fees in the amount of several dollars for such mobile content charges.

30.     Plaintiff in fact paid T-Mobile for such mobile content charges and related service fees.

31.     At no time did Plaintiff authorize the purchase of these products and services offered by Defendants.

32.     At no time did Plaintiff authorize Defendants or anyone else to bill him for these products or services offered by Defendants.

33.     At no time did Defendants verify Plaintiff's purported authorization of these charges.

34.     Defendants have yet to provide a full refund of the unauthorized charges consisting of the premium text message charges, ordinary text messages, data charges, back interest, nor has it implemented adequate procedures to ensure that such unauthorized charges will not appear in future billing periods and/or given an assurance that such unauthorized charges will not appear in future billing periods.

## CLASS ALLEGATIONS

35.     Plaintiff brings this action, pursuant to California Code of Civil Procedure § 382 on behalf of himself and a class, defined as follows:

A. The Class:  all T-Mobile wireless telephone subscribers in the nation who suffered losses or damages as a result of Defendants billing for Thumbplay's mobile content products and services during the 2007 calendar year in the form of ringtones based on copyrighted music owned by Universal Music Group not authorized by the subscriber; provided, however, that the following are excluded from this proposed Class: (i) the Defendant, and (ii) any employee of the Defendant.

36.     The Class consists of thousands of individuals and other entities, making joinder impractical, in satisfaction of California Code of Civil Procedure § 382.

37.     Plaintiff's claims are typical of the claims of all of the other members of the Class.

38.     Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and his counsel are committed to vigorously

prosecuting this action on behalf of the members of the Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

39.     Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

40.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

41.     The factual and legal bases of Defendants' liability to Plaintiff and the other members of the Class are the same, resulting in injury to Plaintiff and to all of the other members of the Class.  Plaintiff and the other members of the Class have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

42.     There are many questions of law and fact common to Plaintiff's claims and the claims of the other members of the Class. Those questions predominate over any questions that may affect individual members of the Class.

43.     Common questions for the Class include but are not limited to:

(a)     Whether Defendants have unjustly received money belonging to Plaintiff and the Class and whether under principles of equity and good conscience, Defendants should not be permitted to retain it.

(b)     Whether Defendants tortiously interfered with contracts between Plaintiff and the Class, on the one hand, and their wireless carriers, on the other hand, by causing them to be charged by their carriers for unauthorized mobile content products and services.

Plaintiff's First Amended Complaint

9

Case No. C 09-03252 RS

(c)     Whether Defendants' conduct as alleged herein constitutes violation of California's Computer Crime Law, Cal. Pen. Code § 502, *et seq*.

(d)     Whether Defendants' conduct as alleged herein constitutes violation of California's Consumer Legal Remedies Act; and

(e)     Whether Defendants' conduct as alleged herein constitutes violation of California's Unfair Competition Law.

## FIRST CAUSE OF ACTION
### (Restitution/Unjust Enrichment)

44.     Plaintiff incorporates by reference the foregoing allegations.

45.     Plaintiff and the other members of the Class have conferred a benefit upon Defendants.  Defendants have received and retained money belonging to Plaintiff and the Class as a result of their billing and collecting significant amounts of money in unauthorized mobile content charges.

46.     Defendants appreciate or have knowledge of said benefit.

47.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the Class, which they have unjustly received as a result of their conduct alleged herein.

48.     Plaintiff and the Class have suffered, and continue to suffer damages as a direct result of Defendants' conduct.

## SECOND CAUSE OF ACTION
### (Tortious Interference with a Contract)

49.     Plaintiff incorporates by reference the foregoing allegations.

50.     Plaintiff and the Class had contractual relationships with T-Mobile whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and T-Mobile's promise to provide various communication and related services to Plaintiff and the other members of the Class, and to bill Plaintiff and the Class only for products or services the purchase of which they authorized.

1

2

51.     Defendants knew of said contractual relationships and intended to and did induce a breach or disruption of those relationships.

3

4

52.     Defendants intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing unauthorized charges to be placed on the cellular telephone bills of T-Mobile subscribers across the nation.

5

6

53.     Plaintiff and the other members of the Class have suffered, and continue to suffer, damages as a direct result of Defendants' conduct.

7

8

**THIRD CAUSE OF ACTION**
**(Violation of California's Computer Crime Law, Cal. Pen. Code § 502)**

9

10

54.     Plaintiff incorporates by reference the foregoing allegations.

11

55.     The wireless devices owned by Plaintiff and the other class members are

12     sophisticated electronic devices which are programmable and capable of being used in

13     conjunction with external files, and contain many (if not most) of the same capabilities and

14     equipment as traditional desktop computers (as well as cellular radio signal processing

15     technology).  These wireless devices are computer systems under the definition of Cal. Pen. Code

16     § 502(b)(5).  Likewise, the mobile content products and services as alleged herein are data under

17     the definition of Cal. Pen. Code § 502(b)(6).

18     56.     The delivery of mobile content to wireless devices is only possible through

19     Defendants' access to the wireless devices of Plaintiff and the other class members.  When the

20     wireless devices owned by Plaintiff and other class members receive mobile content, it consumes

21     computer services as defined by Cal. Pen. Code § 502(b)(4), including computer time, data

22     processing, and storage capacity.  Moreover, Plaintiff and the other class members' wireless

23     service will be terminated unless they pay additional fees for the receipt of the unauthorized

24     mobile content, whether they authorized that mobile content or not.

25     57.     Through the conduct alleged above, Defendants participated in and/or facilitated

26     the transmission of mobile content to the wireless devices owned by Plaintiff and the other class

27     members.  Through this conduct, Defendants violated Cal. Pen. Code § 502(c)(3) by knowingly

28

and without permission using or causing to be used computer services and violate Cal. Pen. Code § 502(c)(4) by knowingly accessing the wireless devices of Plaintiff and the class members and adding data to those devices, without permission.

58.     Plaintiff and the other class members are damaged by those violations. Defendants' violations of Cal. Pen. Code § 502 cause the Plaintiff and the other class members to pay charges for mobile content services to which they did not consent.  Defendants' violation of Cal. Pen. Code § 502 further damage Plaintiff and other class members by causing them to pay falsely inflated wireless service bills to their carrier, as well as the lost time required to sort, read, discard and attempt to prevent future charges for unwanted mobile content services, and lost storage space, connectivity, and computing resources on the wireless devices.

59.     Plaintiff, on his own behalf and behalf of the other class members, seeks compensatory damages in an amount to be determined at trial and injunctive relief or other equitable relief (including an accounting, and disgorgement of fees obtained while these violations were ongoing), as well as reasonable attorney's fees, against Defendants under Cal. Pen. Code § 502(e).

### FOURTH CAUSE OF ACTION
### (Violation of California's Consumer Legal Remedies Act )

60.     Plaintiff incorporates by reference the foregoing allegations.

61.     The mobile content services that are the subject of this First Amended Complaint are services for other than a commercial or business use, as described in Cal. Civ. Code § 1761(b).  The mobile content services are used for personal, family, or household purposes, and mobile content service subscribers are consumers under the definition in Cal. Civ. Code § 1761(d).  Plaintiff and the other members of the class use the wireless services acquired from T-Mobile for personal, family, or household purposes, and are consumers under the definition in Cal. Civ. Code § 1761(d).

62.     Defendants misrepresent the approval for, characteristics of, and the obligations associated with the mobile content services when they transmit billing instructions to T-Mobile,

1

2

3

which indicate that the mobile content services and the related charges for those services were approved. These bills cause the Plaintiff and the other class members to pay charges for mobile content services to which they did not consent, and violate Cal. Civ. Code § 1770(a)(2), (5), (14).

4

5

63.     Collectively, these CLRA violations have damaged the Plaintiff and other members of the class by causing them to pay falsely inflated cellular service bills to T-Mobile as

6

7

well as the lost time required to sort, read, discard and attempt to prevent future charges for unwanted mobile content services, not to mention the lost storage space, connectivity, and

8

9

computing resources on their cellular phones.

64.     Plaintiff, on his own behalf and behalf of the other members, seeks an order

10

enjoining Defendants' CLRA violations alleged herein and the imposition of a constructive trust

11

on and restitution of property gained by the CLRA violations, and court costs and attorney's fees

12

under the CLRA (Cal. Civ. Code § 1780(d)).

13

14

**FIFTH CAUSE OF ACTION**
**(Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200)**

15

65.     Plaintiff incorporates by reference the foregoing allegations.

16

66.     Defendants' charges to Plaintiff and the other class members falsely state that

17

Plaintiff and the other Class members have approved, authorized, and/or consented to charges for

18

mobile content services, and are deceptive and unfair. Further, Defendants' charges are unlawful

19

because they violate the Consumer Legal Remedies Act ("CLRA"), the Computer Fraud and

20

Abuse Act ("CFAA"), the Federal Communications Act ("FCA"), and/or Penal Code § 502, *et*

21

*seq*.

22

67.     The acts alleged above are unlawful, unfair or fraudulent business acts or practices

23

and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

24

68.     These UCL violations have damaged Plaintiff and the other class members by

25

causing them to pay falsely inflated wireless service bills to T-Mobile, as well as the lost time

26

required to sort, read, discard and attempt to prevent future charges for unwanted mobile content

27

28

Plaintiff's First Amended Complaint

13

Case No. C 09-03252 RS

services, not to mention the lost storage space, connectivity, and computing resources on the wireless devices.

70.     Plaintiff, on his own behalf and behalf of the other Class members, seeks an order enjoining Defendants' unfair competition alleged herein, and restitution of property gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorneys' fees and costs pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiff Rudolf Zijdel, on behalf of himself and the Class, prays for the following relief:

a)  Certify this case as a class action on behalf of the Class defined above, appoint Rudolf Zijdel Class Representative, and appoint Parisi & Havens, LLP, as lead counsel;

b)     Declare that Defendants' actions, as set out above, constitute unjust enrichment and tortious interference with a contract, and are violations of the CLRA, Cal. Pen. Code § 502, *et seq*., and the UCL;

c)     Enter judgment against Defendants for all economic, monetary, actual, consequential, and compensatory damages caused by their conduct, and if such conduct is proved willful, award Plaintiff and the Class exemplary damages;

d)     Award Plaintiff and the Class reasonable costs and attorneys' fees;

e)     Award Plaintiff and the Class pre- and post-judgment interest;

f)     Enter judgment for injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

g)     Award such other and further relief as equity and justice may require.

1

**JURY DEMAND**

2

Plaintiff requests trial by jury of all claims that can be so tried.

3

4
                                        Respectfully submitted,

5
Dated:  October 20, 2009              PARISI & HAVENS, LLP

6

7
                                      By: /s/  David C. Parisi

8                                         David C. Parisi
                                          Attorneys for RUDOLF ZIJDEL,
9                                         individually and on behalf of a class of
                                          similarly situated individuals
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's First Amended Complaint           15                    Case No. C 09-03252 RS